MICHELLE ZAMARIN (DC Bar #474042)
*pro hac pending*
Email: ZamarinMi@SEC.GOV
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Telephone: (202) 793-0656

LOCAL COUNSEL
Gary Y. Leung (Cal. Bar # 302928)
Email: LeungG@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>JOHN DAVID GESSIN (a/k/a John David), an individual, EQUIFUNDS, INC., a California Corporation, and ICE FLEET LLC, a Delaware limited liability company,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

4. In addition, venue is proper because Defendants Equifunds, Inc. ("Equifunds") and Ice Fleet LLC ("Ice Fleet") are, or were, headquartered in this district, and Defendant John D. Gessin ("Gessin") resides in this district.

## SUMMARY

5. This is a civil enforcement action concerning securities fraud by Gessin, Equifunds, and Ice Fleet. Gessin founded Equifunds and Ice Fleet ostensibly for engaging in business operations relating to the purchase, sale, and distribution of fuel. Presenting himself as a successful entrepreneur – and using the alias "John David" so that prospective investors would not learn of his criminal history or prior lawsuits and bankruptcies – Gessin raised over $1.6 million on behalf of Ice Fleet and Equifunds between March 2017 and January 2020, from a small group of inexperienced retail investors.

6. Gessin falsely told his investors that the funds they entrusted to him would be used solely for business purposes, and that he was not using "a dime" of their money for his personal benefit.

7. In fact, and in direct contradiction to his representations, Gessin plundered Equifunds and Ice Fleet in order to fund his lifestyle, using company funds to pay for, among other things: the mortgage on a home in a gated community, automobiles, hotels and restaurants, house cleaning services, and gifts and other payments to his friends and family members.

8. In March 2020, Gessin suddenly stopped paying his investors, falsely telling them that the COVID-19 pandemic had severely harmed his businesses. Even after Equifunds received nearly $1.3 million in COVID-19 Economic Injury Disaster Loans from the Small Business Administration, Gessin continued to tell investors that he and Equifunds were heading for bankruptcy, while using Equifunds as his personal piggybank.

9. As a result of the conduct alleged herein, Defendants have violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

10. The SEC seeks permanent injunctions prohibiting the Defendants from committing any future violations of the federal securities laws, an officer and director bar against Defendant Gessin, and an order requiring Defendants to disgorge their ill-gotten gains with prejudgment interest thereon pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), (5) and (7), and imposing civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

## THE DEFENDANTS

11. **Gessin** is a resident of Laguna Niguel, California. He founded and is the sole principal of Equifunds. He has signatory authority over all of Equifunds' bank accounts. Gessin also founded and was the sole principal of Ice Fleet. He had signatory

authority over all of Ice Fleet's bank accounts.

12. **Equifunds** is a California corporation headquartered in Laguna Niguel, California. Gessin is Equifunds' founder and its sole principal. He has exclusive authority and decision-making with respect to Equifunds' business operations. Equifunds is liable for Gessin's misstatements, acts, and omissions under, among other things, agency principles and the doctrine of *respondeat superior*.

13. **Ice Fleet** is a Delaware LLC headquartered in Beverly Hills, California that apparently ceased business operations in or around 2020. Gessin founded Ice Fleet and was its sole principal. He had exclusive authority and decision-making with respect to Ice Fleet's business operations. Ice Fleet is liable for Gessin's misstatements, acts, and omissions under, among other things, agency principles and the doctrine of *respondeat superior*.

## FACTS

### A. Background and Founding of Equifunds and Ice Fleet

14. Gessin is a self-described entrepreneur with a history of lawsuits and bankruptcies stemming from allegations that he defrauded and misappropriated funds from business partners, friends, and acquaintances.

15. In 2010, for example, Gessin was found liable for defrauding a high school teacher he met on Match.com out of her life savings, which he lost day-trading in the stock market. Gessin also has multiple default judgments against him for failure to repay loans and promissory notes under which he agreed to pay his counterparties substantially above-market rates.

16. In or around November 2013, Gessin founded Defendant Ice Fleet, subsequently representing to prospective investors and business partners that Ice Fleet was in the commercial refueling business.

17. Gessin founded Equifunds in or around March 2017, subsequently representing to prospective investors and business partners that Equifunds was an entity through which he was managing investments in commercial fueling operations and

3

renewable energy.

18. In fact, as described below, Gessin used Ice Fleet and Equifunds to target and fleece unsophisticated retail investors—including an artist and her U.S. military veteran spouse, a real estate agent, a former government employee, and an elderly retired nurse in an assisted living facility. Ultimately, Gessin defrauded these individuals of over $1.2 million.

### B. Defendants' Misrepresentations and Omissions to Investors

#### i) Investors A and B

19. Investor A is a digital artist who resides in Playa Del Rey, California. In or around 2014, she met Defendant Gessin—who was using the alias "John David"—via a mobile dating and social networking application. He described himself as a successful venture capitalist. Thereafter, Investor A asked Gessin for investment and business advice from time to time.

20. In or around March 2017, Gessin persuaded Investor A and her U.S. military veteran spouse, Investor B, to invest $30,000 in Equifunds, explaining that the money would be used to purchase fuel in support of a commercial shipping business located in the Port of Long Beach, CA.

21. Gessin offered Investors A and B monthly interest payments on their investment at an above-market rate of 12% annually. Although Investors A and B believed they were investing in Equifunds, Gessin subsequently provided them with a $30,000 promissory note from Ice Fleet.

22. In April and May 2017, Investors A and B invested an additional $83,995 with Equifunds. They funded most of the new investment with loans and credit card advances, which Gessin explained would be a profitable strategy in light of the interest rate he was offering them. Though Gessin repeatedly promised that he would do so, he did not provide Investors A and B with any written documentation in support of these additional investments.

23. In or around late 2018, Investors A and B informed Gessin that they wanted

to withdraw their investments with him. Gessin refused and instead said their money was "tied up" in a new venture to purchase the JH Mitchell & Sons commercial vehicle refueling depot ("the Mitchell depot") in Baldwin Park, CA. Gessin explained that he intended to use the Mitchell depot to manufacture and distribute biodiesel fuels, which would allow him to take advantage of new and lucrative government incentives.

24. After providing Investors A and B with a tour of the Mitchell depot, Gessin offered to increase the interest rate on their investment to 24% annually, but Gessin told them he would only do so if they invested additional funds with him. He sweetened his offer by agreeing to pay a monthly sum to cover the interest owed on their loans and credit card advances. In response to Gessin's offer, Investors A and B invested an additional $45,550 in Equifunds, funded almost entirely with credit card advances, bringing their total investment to $159,545.

25. Gessin never disclosed to Investors A and B his true identity, criminal history, bankruptcies, or that he had been the subject of lawsuits involving allegations of fraud and misappropriation of funds.

26. Had he done so, Investors A and B would not have invested money with Gessin, Ice Fleet, or Equifunds.

    **ii) Investor C**

27. Investor C is a real estate agent who resides in Playa Del Rey, CA. Her neighbor, Investor A, introduced her to Gessin, who was still using the alias "John David."

28. Gessin offered Investor C monthly interest payments at a 15% annual rate in exchange for a $100,000 investment in Equifunds. At Gessin's instruction, Investor C wired $100,000 to Equifunds in or around July 2017. Though the funds were wired to Equifunds, Gessin provided Investor C with a $100,000 promissory note from Ice Fleet, which he signed on behalf of Ice Fleet as "John David."

29. In or around November 2018, Investor C invested an additional $20,000 with Gessin in response to an offer to increase the annual interest rate to 18%, wiring the

funds to Equifunds at his instruction.

30. The investment represented essentially all of Investor C's life savings.

31. Gessin also offered Investor C equity shares in Equifunds if she introduced him to other potential investors.

32. Gessin falsely represented to Investor C that: (1) investor funds would be used solely to purchase and resell fuel; (2) he had personally invested millions of dollars in his business enterprises, and (3) he was so committed to their success that he was not using "a dime" of company funds to pay himself a salary, or even to reimburse his day-to-day expenses.

33. Investor C relied on these representations when she invested her own funds with Gessin and when she subsequently recommended him to other potential investors.

34. Gessin also told Investor C that he had an insurance policy on the receivables for the fuel he was selling and distributing. He falsely assured Investor C that her investment would be 100% protected by that policy and claimed that he would add her as a named beneficiary under the policy.

35. Gessin never disclosed to Investor C his true identity, criminal history, bankruptcies, or that he had been the subject of lawsuits involving allegations of fraud and misappropriation of funds.

36. Had he done so, Investor C would not have invested money with Gessin, Ice Fleet, or Equifunds, or recommended such investments to others.

        **iii) Investor D**

37. Investor D, now recently deceased, was a 92-year-old retired nurse residing in Palm Desert, CA. She learned of the investment opportunity with Gessin from her neighbors, Investors A and C, while all three were living in a condominium community in Playa Del Rey, CA.

38. In or around November 2018, Gessin took Investor D (accompanied by Investor C) on a tour of the Mitchell depot, which he said he was in the process of purchasing. Gessin told Investor D that he had developed a new technology to improve

the efficiency of biodiesel fuel. He also falsely told her that he had a contract with the large, Mexican-government-owned petroleum company Pemex to supply and distribute fuel from the Mitchell depot.

39. Gessin also took Investor D (accompanied by Investor C) to an office located near Los Angeles International Airport, where he showed her a brochure containing photographs of fuel trucks, as well as storage tanks and signage jointly branded with the JH Mitchell and Pemex logos. He also introduced Investor D to a person he said was a representative of Pemex.

40. Shortly after her meeting with Gessin, Investor D invested $200,000 in Equifunds in exchange for monthly interest payments at a 24% annual interest rate. Gessin provided her with a promissory note, which he signed on behalf of Equifunds.

41. Investor D subsequently moved into an assisted living facility in Palm Desert, CA. Gessin visited Investor D at the assisted living facility on multiple occasions, including on her birthday, taking her out for expensive meals. Gessin also took Investor D for a driving tour, showing her gas stations that he said would be distributing his fuel. On another occasion, Gessin showed Investor D a video of a railyard near the Port of Long Beach, from which he said he would be distributing fuel by rail.

42. Gessin also told Investor D that he had an insurance policy on the receivables for the fuel he was selling and distributing. He falsely assured Investor D that her investment would be 100% protected by that policy and claimed that he would add her as a named beneficiary under the policy.

43. Relying on Gessin's false and misleading representations, between December 2018 and January 2020, Investor D made nine additional investments in Equifunds, each ranging from $100,000 to $200,000—investing a total of $1.2 million in Gessin's fraudulent scheme. The $1.2 million represented the bulk of her life savings.

44. Gessin never disclosed to Investor D his criminal history, bankruptcies, or that he had been the subject of lawsuits involving allegations of fraud and

1 misappropriation of funds. Had he done so, Investor D would not have invested money
2 with Gessin or Equifunds.

                iv)    **Investor E**

4       45.    Investor E is a 71 year-old retiree and former government employee who
5 resides in Culver City, CA. She is a friend of Investor D and an acquaintance of Investor
6 C. After hearing about Investor C's and D's investments with "John David" at above-
7 market rates, Investor E asked for information about the investment opportunity.

8       46.    Investors C and D conveyed to Investor E the oral representations they had
9 received from Gessin about his business activities and plans, and also showed Investor E
10 the brochure containing photographs of fuel trucks, and storage tanks and signage jointly
11 branded with the JH Mitchell and Pemex logos. Investor E decided to invest in
12 Equifunds.

13       47.    At Gessin's oral direction, Investor C informed Investor E that she would
14 receive monthly interest payments at an annual rate of 20% if she invested at least
15 $100,000 with Equifunds. In or around April 2019, Investor E invested $100,000 with
16 Equifunds. In September 2019, she increased her investment to $150,000, receiving a
17 promissory note signed on behalf of Equifunds by "J. David." The $150,000 investment
18 represented substantially all of Investor E's life savings.

19       48.    Investor E was not aware of Gessin's true identity, criminal history,
20 bankruptcies, or that he had been the subject of prior lawsuits involving allegations of
21 fraud and misappropriation of funds. Had she been aware, Investor E would not have
22 invested money with Gessin or Equifunds.

23       **C.**    **Defendants Suddenly Stopped Paying Investors and Cut Off Contact**

24       49.    Through early 2020, Defendants Gessin, Equifunds, and Ice Fleet made
25 monthly interest payments to Investors A through E (collectively, "the Investors") per the
26 agreed-upon terms as described above. However, in or around March 2020, Defendants
27 abruptly stopping paying each of the Investors.
28       50.    Initially, Gessin claimed that his business operations at the Mitchell depot

1 had been disrupted by the COVID-19 pandemic, and that the payments would resume in a few months. However, after the payments did not resume as expected, Investors A and B contacted the Mitchell depot. They learned that the facility had been operating normally throughout the pandemic.

51. They also learned that neither Gessin, Ice Fleet, nor Equifunds had any ownership interest in the facility. To the contrary, Gessin had been banned from the premises in or around May 2019, as a result of an ongoing business dispute Gessin had with the actual owner of the facility.

52. After being confronted by Investors A and B about his misrepresentations and omissions concerning the Mitchell depot, Gessin cut off all contact with them. He also stopped replying to calls and messages from Investor D.

### D. Defendants' Continuing Misrepresentations

53. Through October 2022, Gessin continued to make false and misleading statements to Investor C, claiming that the COVID-19 pandemic and other setbacks had severely damaged his businesses and left him unable to repay investors. In fact, he continued to own and operate Equifunds and pursue new business ventures, with the assistance of large cash infusions from Small Business Administration COVID-19 Economic Injury Disaster Loans ("EIDLs).

54. On or around June 29, 2021, Equifunds received an EIDL payment in the amount of $484,900. On or around December 28, 2021, Equifunds received an EIDL payment in the amount of $793,900. Although EIDL proceeds may be used for any ordinary business expense, including to repay debts and make interest payments, Defendants have not made a single payment to any of the Investors since March 2020.

55. To date, the Investors' losses exceed $1.2 million, not including the monthly interest payments they are owed:

///
///
///

| Investor | Loss of Investment Principal |
|---|---|
| Investors A and B | $48,480.00 |
| Investor C | $51,450.00 |
| Investor D | $998,000.00 |
| Investor E | $128,683.00 |
| TOTAL: | $1,226,613.00 |

### E. Gessin's Misappropriation of Funds

56. Moreover, contrary to his representations that he would not use "a dime" of company funds for his personal benefit, Gessin routinely misappropriated funds from Ice Fleet and Equifunds to pay for, among other things, the mortgage on a home in a gated community, automobiles, house cleaning services, hotels, restaurant meals, and payments to friends and family members—including wedding, graduation, and Bar Mitzvah gifts, and the payoff of a loan on his significant other's Range Rover.

57. Gessin also routinely commingled funds in his business and personal bank accounts, with net transfers from Equifunds and Icefleet to his personal accounts in excess of $137,000.

| Type of Expense or Activity | Approximate Amount Spent (2017 to 2021) |
|---|---|
| Payments and Gifts to Friends and Family Members | $450,000 |
| Net Transfers to Personal Bank Accounts | $137,000 |
| Mortgage and Real Estate Tax Payments | $117,000 |
| Luxury Automobile Payments | $18,500 |
| Hotels, Vacations, and Restaurants | $15,000 |

| Type of Expense or Activity | Approximate Amount Spent (2017 to 2021) |
|---|---|
| Shopping (Apparel, Electronics, Luxury Brands, Furniture) | $12,000 |
| House Cleaning Services | $11,500 |

58. In fact, within days of receiving the Small Business Administration EIDL payments described above, Gessin made large transfers from Equifunds to his personal bank accounts, to his friends and family members, and to another business entity in which he is a co-owner.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Sale of Securities in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

59. The SEC realleges and incorporates by reference paragraphs 1 through 58 above.

60. By engaging in the conduct described above, Defendants Gessin, Equifunds, and Ice Fleet, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

61. By engaging in the conduct described above, Defendants Gessin, Equifunds, and Ice Fleet violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b), and 240.10b-5(c).

///

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### in Violation of Section 17(a) of the Securities Act

62. The SEC realleges and incorporates by reference paragraphs 1 through 58 above.

63. By engaging in the conduct described above, Defendants Gessin, Equifunds, and Ice Fleet, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

64. By engaging in the conduct described above, Defendants Gessin, Equifunds, and Ice Fleet violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

///

///

**II.**

Issue an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Sections 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Defendant Gessin from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

**III.**

Order Defendants to disgorge all ill-gotten gains received from their illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3), (5) and (7).

**IV.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**V.**

Pursuant to Section 21(d)(5) of the Exchange Act, permanently restrain and enjoin Defendant Gessin from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

///

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, the SEC demands trial by jury.

Dated: March 14, 2023

/s/ *Gary Y. Leung*
Gary Y. Leung
Michelle Zamarin
Attorneys for Plaintiff
Securities and Exchange Commission